IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2015-NMSC-010

Filing Date: March 12, 2015

Docket No. 33,967

STATE OF NEW MEXICO,

     Plaintiff-Appellee,

v.

NATHAN MONTOYA,

     Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF RIO ARRIBA COUNTY**
**Michael E. Vigil, District Judge**

Jorge A. Alvarado, Chief Public Defender
Nicole S. Murray, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Jacqueline R. Medina, Assistant Attorney General
Santa Fe, NM

for Appellee

## OPINION

**VIGIL, Chief Justice.**

**{1}** This case presents another example of the ongoing confusion created by our child abuse jury instructions. Breandra Pena (Baby Breandra), age seventeen months, died while in the care of Nathan Montoya (Defendant). Defendant was convicted of intentional child abuse resulting in the death of a child under twelve contrary to NMSA 1978, Section 30-6-1(D), (H) (2009) and sentenced to life imprisonment.

**{2}** In our review of Defendant's conviction on direct appeal, we first hold that the jury

instructions used in Defendant's trial accurately instructed the jury of the law and did not constitute reversible error. We determine that, when considered as a whole, the instructions used in this case are distinguishable from those used in previous cases which we have reversed based on erroneous child abuse jury instructions. We also hold that reckless child abuse may, in some cases, be a lesser included offense of intentional child abuse resulting in the death of a child under twelve, and disavow New Mexico cases suggesting otherwise. Accordingly, we determine that when a jury is correctly instructed on both reckless and intentional child abuse resulting in the death of a child under twelve, a step-down instruction is appropriate.

{3}    Next, we hold that the admission of a forensic pathologist's expert testimony was not in error and that sufficient evidence was presented to convict Defendant. Finally, we hold that it was abuse of discretion for the district court judge to refuse to consider mitigating the basic sentence of life imprisonment, based on the court's mistaken understanding that the life sentence was mandatory and could not be altered. Defendant's conviction for intentional child abuse is affirmed and the case is remanded to the district court for resentencing with consideration of potential mitigating circumstances.

## I.    BACKGROUND

### A.    Facts

{4}    Baby Breandra was born to Melissa Romero (Mother) and Andrew Pena on September 24, 2009. Mother occasionally asked her cousin, Edwardine Fernandez (Fernandez), Breandra's godmother, and Defendant to look after Baby Breandra. On March 4, 2011, when Baby Breandra was seventeen months old, Fernandez and Defendant picked up Baby Breandra from Mother's home in Albuquerque and took her to their home in Española for the weekend. When Fernandez and Defendant picked up Baby Breandra from Mother, she had no signs of bumps or bruises on her body.

{5}    On March 8, 2011, Fernandez was at work by 7:00 a.m. at St. Vincent Hospital in Santa Fe, leaving Defendant at home alone with Baby Breandra. Fernandez was in contact with Defendant regularly throughout the day, about once an hour. At about 9:00 a.m., Defendant's friend Derek Vigil (Vigil) visited Defendant at home. Vigil left around 11:30 a.m. or noon. When Vigil left, he did not see any signs that Baby Breandra was in distress.

{6}    Around 1:42 p.m., Defendant called 911 and told the operator that Baby Breandra had been teething, had not been feeling well, had been throwing up, and was not coming back. Defendant reported that Baby Breandra still had a heartbeat. He did not report that the baby had fallen in the bathtub, or that he dropped her, as he later claimed. Paramedics were dispatched in response to a child having difficulty breathing. While en route to the scene, the paramedics received an update that the child had stopped breathing, and a second update that the child had no heartbeat.

**{7}** The paramedics arrived at Defendant's home at 1:48 p.m. When they arrived, Defendant was standing in the doorway holding Baby Breandra, who was limp, nonresponsive, and pale. The paramedics noted that Baby Breandra had bruising throughout her body, including marks on her chest and belly and a scrape on her nose, and that her ears were red, bruised, and swollen. The paramedics immediately began life saving measures on Baby Breandra, but knew she was dead as soon as they got her on the gurney in the ambulance.

**{8}** Randy Sanchez, one of the responding paramedics, testified as an expert witness in the field of EMT paramedics. Mr. Sanchez testified that based on her cool, pale skin, he believed Baby Breandra was deceased before Defendant placed the call to 911. In his opinion, the baby's injuries were not consistent with choking. Mr. Sanchez said it was fairly obvious that the baby had sustained traumatic injuries.

**{9}** Deputy Jason Gallegos of the Rio Arriba County Sheriff's Office testified that he was dispatched to a call regarding an unresponsive baby at Defendant's home. Deputy Gallegos approached Defendant and asked him what happened. Defendant told Deputy Gallegos that he had been watching Baby Breandra and she was teething and grumpy. Defendant said he and Baby Breandra were sitting on the bed, eating cheese and crackers and watching cartoons. Baby Breandra wouldn't stop crying, so Defendant decided to give her a bath. Defendant said that after the bath, he decided to put the baby down for a nap, so he laid her on the bed and gave her a sippy cup of milk. Defendant said Baby Breandra started choking on the milk and she threw up a light brown substance. Defendant said he patted her on the back to try to dislodge whatever the baby was choking on. After speaking to Deputy Gallegos, Defendant cried and paced around the house, asking if the baby was ok.

**{10}** In her statement to the police, Fernandez said that Defendant called her earlier that day and told her that Baby Breandra was fussy because she was teething. Defendant told Fernandez that he gave Baby Breandra Tylenol because she was drooling and felt feverish, and he gave her some Orajel. Defendant reported to Fernandez that he suspected the Orajel made Baby Breandra throw up, and he called 911 because she threw up and was choking. At trial, Fernandez recounted that at 12:47 p.m., Defendant had called to tell her that Baby Breandra had fallen in the bathtub and scraped her nose, but otherwise seemed fine. Fernandez said she forgot to tell the police in her statement that Defendant said Baby Breandra had fallen in the tub.

**{11}** Agent Joey Gallegos interviewed Defendant at the New Mexico State Police Office in Española. Agent Gallegos testified that after he told Defendant that Baby Breandra was dead, Defendant said, "I slapped her. I got her by her ears and she didn't want to keep quiet." When Agent Gallegos showed Defendant pictures of Baby Breandra's injuries and asked if Defendant had caused them, Defendant responded, "Yeah, that one that she has, yeah. I did spank her and all of that. That's what I'm saying." Later in his statement to the police, Defendant claimed that the baby fell in the bathtub, and that he accidentally dropped her while running to the living room.

**{12}** Dr. Clarissa Krinsky, Assistant Professor of Pathology at the University of New Mexico and Medical Investigator at the Office of the Medical Investigator, testified as an expert in forensic pathology. Dr. Krinsky supervised the autopsy of Baby Breandra on March 9, 2011. Dr. Krinsky observed abrasions covering large areas of both sides of the baby's head and contusions on both ears. Dr. Krinsky opined that the injuries to Baby Breandra's ears were intentional, caused by someone grabbing and pulling them, and could not have been caused by the baby herself. Dr. Krinsky saw between forty and fifty bruises on Baby Breandra's back, chest, and abdomen. The baby also had subdural and subarachnoid hemorrhages on both sides of the brain, indicative of significant head trauma. Dr. Krinsky said these types of injuries were unlikely to be caused by a fall in a bathtub. Dr. Krinsky also found significant internal abdominal injuries, which she characterized as classic intentional injuries found in children who were punched or kicked in the stomach.

**{13}** Dr. Krinsky said that Baby Breandra's death was the result of multiple blunt force injuries. Dr. Krinsky concluded that the constellation of injuries on Baby Breandra's body was a result of intentional, nonaccidental trauma, and that the manner of death was homicide, which she defined as death at the hands of another.

## B. Procedure

**{14}** Defendant was charged with abuse of a child resulting in the death of Baby Breandra, a child under twelve, caused by knowingly, intentionally, or recklessly,[1] and without justifiable cause, endangering, torturing, or cruelly punishing the child contrary to Sections 30-6-1(D)(1) or (2) and (H). Defendant was convicted of intentional child abuse resulting in the death of a child under twelve and sentenced to life in prison. Defendant appealed directly to this Court pursuant to Rule 12-102(A)(1) NMRA and Article VI, Section 2 of the New Mexico Constitution. Further procedural background is provided below as necessary.

## II. DISCUSSION

---

[1]While we acknowledge that "negligent child abuse" was the language in use at the time of Defendant's indictment and trial, we now refer to it as "reckless child abuse" in accordance with our holding "that what has long been called 'criminally negligent child abuse' should hereafter be labeled 'reckless child abuse' without any reference to negligence." *State v. Consaul*, 2014-NMSC-030, ¶ 37, 332 P.3d 850. While we refer in the text and record citations only to "reckless," we do not endeavor in this opinion to retrofit every quotation containing reference to "negligent" with "reckless." While *Consaul* addressed child abuse cases involving great bodily harm, rather than death, the same statute containing the now-renounced negligence language is at issue here, and thus we now expressly adopt the same rule that "'criminally negligent child abuse' should hereafter be labeled 'reckless child abuse' without any reference to negligence" for cases of child abuse resulting in death. *See id.* ¶¶ 35-37.

4

**{15}** Defendant advances numerous arguments on appeal, including: that the jury instructions used at trial were a misstatement of the law and misled the jury, that the pathologist's expert testimony about a "constellation of injuries" on the baby should not have been admitted, that the State failed to present sufficient evidence to support Defendant's conviction, that he received ineffective assistance of counsel, and that the district court's failure to consider potential mitigating circumstances in sentencing Defendant was an abuse of discretion. We address each argument in turn.

## A.    Jury Instructions

**{16}** Defendant argues that jury instruction number three erroneously combined the elements of both intentional and reckless child abuse, which Defendant asserts was a misstatement of the law, was confusing to the jury, and constitutes reversible error. We recently clarified an aspect of our Uniform Jury Instructions governing child abuse that "potentially contribute[d] to jury confusion, resulting in unjust child abuse convictions." *See Consaul*, 2014-NMSC-030, ¶ 38 (holding that the Legislature intended to require proof of recklessness to sustain a conviction for negligent child abuse and requiring juries to be instructed using the reckless disregard standard). This case presents us with a similar opportunity to clarify two other aspects of our jury instructions. We clarify when separate instructions are required to prove reckless or intentional child abuse. We also clarify that in some circumstances, like in the case at bar, reckless child abuse may be a lesser-included offense of intentional child abuse.

### 1.    Procedural background

**{17}** The confusion caused by the dissonance between our case law and our jury instructions for child abuse resulting in the death of a child under twelve is epitomized by the argument which took place in the district court below regarding the proper instructions. Just before closing arguments, the district court and the parties held an extensive discussion about the correct form of the jury instructions.

**{18}** The State began the discussion by noting that "[i]n regards to the elements of the child abuse charge—well, for the record, this particular instruction should have been changed per the higher Courts back in the 90's and it never was, so it's kind of a difficult instruction to work with." The State told the district court that it did not "want to follow the [Uniform Jury Instruction] [(]UJI[)] when it comes to reckless disregard and intentional." The State recognized that "[w]hen it comes to intentional child abuse and reckless child abuse . . . the Jury has to make clear which one they find," but argued that there would be no problem with an elements instruction containing both theories as long as there was a special interrogatory. Thus, the State proposed a single jury instruction which contained elements of both intentional and reckless child abuse, along with a special interrogatory form on which the jury could indicate which type of abuse it found.

**{19}** Defendant asserted that the elements of intentional and reckless should be in two

5

separate instructions. Defendant argued that the jury would need to clearly indicate whether it found intentional or reckless child abuse, and therefore, "[t]here is a problem with having two theories in one instruction." Defendant also argued that the jury should first consider whether Defendant was guilty of intentional child abuse, and if not, consider whether he was guilty of reckless child abuse, and if not, find him not guilty. Thus, Defendant proposed two instructions, one containing the elements of intentional abuse and another for reckless abuse. Defendant also proposed a step-down-type instruction to guide the jury in considering each of the crimes in turn.

{20}    In ruling on the jury instructions, the district court observed that if ten years ago, this Court said the jury instructions should be changed, "and the UJI Committee did not change it, it's because they didn't think it needed to be changed. They don't just ignore cases." The district court thus surmised that the Committee and the Court had discussed whether the instructions needed to be changed and decided against it. The State noted that "[t]he UJI is wrong. We don't want to follow the UJI when it comes to reckless disregard and intentional," and that "we're all in agreement that this should have been changed." The district court nonetheless concluded that "the [C]ommittee must have thought [the problem with the combined elements instruction] can [be] handled by a special interrogatory where you ask the Jury to designate on what theory." Accordingly, the district court rejected both of Defendant's proposed instructions and accepted the State's combined elements instruction and its special interrogatory form.

{21}    The disputed elements instruction submitted to the jury read as follows:

INSTRUCTION NO. 3

For you to find the defendant guilty of child abuse resulting in death as charged in Count 1, the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
1.      The defendant caused Breandra Pena to be placed in a situation which endangered the life or health of Breandra Pena, or tortured or cruelly punished Breandra Pena;
2.      The defendant acted intentionally or with reckless disregard and without justification. To find that the defendant acted with reckless disregard, you must find that the defendant knew or should have known the defendant's conduct created a substantial and foreseeable risk, the defendant disregarded that risk and the defendant was wholly indifferent to the consequences of the conduct and to the welfare and safety of Breandra Pena;
3.      The defendant's actions resulted in the death of Breandra Pena;
4.      Breandra Pena was under the age of 12;
5.      This happened in New Mexico, on or about the 8th day of March, 2011.

Instruction number four defined "intentionally" as set out in UJI 14-610 NMRA: "A person

6

acts intentionally when the person purposely does an act. Whether the defendant acted intentionally may be inferred from all of the surrounding circumstances, such as the defendant's actions or failure to act, conduct and statements."

**{22}** Instruction number thirteen was a type of instruction"commonly referred to as a 'step-down' instruction," and directed the jury on the use of the special interrogatory forms. *See State v. Garcia*, 2005-NMCA-042, ¶ 18, 137 N.M. 315, 110 P.3d 531 (discussing the proper use of UJI 14-250 NMRA, the step-down instruction used for varying levels of homicide offenses). The instruction read as follows:

> If you find the defendant guilty of abuse of a child resulting in death, then you must determine whether the crime was committed intentionally or with reckless disregard. You must complete the special form to indicate your finding. For you to make a finding that the crime was committed intentionally, the state must prove to your satisfaction beyond a reasonable doubt that the crime was committed intentionally. If you decide the crime was committed intentionally, than [sic] this is the only special form you complete. If you have reasonable doubt that the crime was committed intentionally, then you must decide whether the crime was committed with reckless disregard. For you to make a finding that the crime was committed with reckless disregard, the state must prove to your satisfaction beyond a reasonable doubt that the crime was committed with reckless disregard. If you decide the crime was committed with reckless disregard, then this is the only special form youcomplete. If you have reasonable doubt that the crime was not committed with intentionally or with reckless disregard, then you must find the defendant not guilty of abuse of a child resulting in death.

The special interrogatory form read: "Do you unanimously find beyond a reasonable doubt that the crime of abuse of a child resulting in death was committed intentionally? _____ (Yes or No)." The jury foreperson wrote "yes" on the line. A second special interrogatory form asked the same question about reckless disregard. The jury did not complete this form.

**{23}** During its deliberation, the jury sent a question to the district court requesting the definition of reckless disregard comparable to the definition of intent provided in instruction number four. The district court suggested, and both parties agreed, that there was no further definition the district court could provide. Accordingly, the district court told the jury that the legal definition of reckless disregard was already contained in instruction number three, paragraph two.

**{24}** Defendant argues that the jury instructions misstated the law and confused or misdirected the jury. We acknowledge the inconsistencies between our case law and our jury instructions noted by the district court and the attorneys in the proceedings below. Nonetheless, we find the facts of this case distinguishable from previous cases in which we have reversed convictions of child abuse based on faulty jury instructions. We conclude that

the use of our current instructions, as supplemented by the district court, was sufficient to properly instruct the jury in this case and therefore affirm Defendant's conviction.

**2.      Standard of review**

**{25}**      "The standard of review we apply to jury instructions depends on whether the issue has been preserved. If the [issue] has been preserved we review the instruction for reversible error." *Cabezuela*, 2011-NMSC-041, ¶ 21, 150 N.M. 654, 265 P.3d 705 (alteration in original) (internal quotation marks and citations omitted). In this case, Defendant preserved the issue by objecting to the instruction which combined the elements of intentional and reckless abuse, and to the special interrogatory form. *See id.* ("In this case, defense counsel preserved the jury instruction claim when he objected to the inclusion of the words 'failure to act' in Instruction No. 3, and therefore, we review for reversible error."). Accordingly, this Court's review of the instruction is for reversible error. *See id.* "Reversible error arises if . . . a reasonable juror would have been confused or misdirected." *Id.* ¶ 22 (omission in original) (internal quotation marks and citation omitted). "[Jury instructions] are to be read and considered as a whole and when so considered they are proper if they fairly and accurately state the applicable law." *Id.* ¶ 21 (alteration in original) (internal quotation marks and citation omitted).

**3.      The jury instructions in this case do not constitute reversible error**

**{26}**      Defendant argues that *Cabezuela* stands for the proposition that error occurs where the elements of both intentional and reckless child abuse are contained in one instruction. Defendant misreads the holding of *Cabezuela*. In *Cabezuela*, the defendant was charged with intentional child abuse resulting in the death of a child under twelve years of age contrary to Sections 30-6-1(D)(1) and 30-6-1(H). *Cabezuela*, 2011-NMSC-041, ¶¶ 16, 27. The district court issued an elements instruction which read, in relevant part: "[The defendant] caused [the baby] to be placed in a situation which endangered the life or health of [the baby]; . . . [the] defendant acted intentionally; . . . [the defendant's] actions or failure to act resulted in the [baby's death]." *Id.* ¶ 18. The defendant was convicted of intentional child abuse resulting in death. *Id.* ¶ 15.

**{27}**      This Court held that the elements instruction was a misstatement of the law because it included "failure to act," which was aligned with a theory of reckless child abuse, an offense with which the defendant was not charged. *Id.* ¶¶ 33, 36. The Court concluded that the jury was misdirected by the instructions tendered because the jury could have convicted the defendant for intentional child abuse, the only crime with which she was properly charged, based on an instruction indicating a theory of reckless child abuse. *Id.* ¶ 36.

**{28}**      We find the error in *Cabezuela* distinguishable from the purported error in this case. The defendant in *Cabezuela* was not charged with reckless child abuse, yet the jury instructions indicated a theory of reckless child abuse. *Id.* ¶¶ 27, 34. Because the jury instructions used in *Cabezuela* suggested two distinct theories of child abuse, intentional and

8

reckless, and no definition of reckless abuse was provided, the jury could have convicted the defendant of intentional child abuse based on a theory of recklessness. *Id*. ¶¶ 34, 36. Therefore, we held that the jury instructions constituted reversible error. *Id*. ¶ 36.

**{29}** In the instant case, because the special verdict forms clearly indicated which crime Defendant was convicted of, we hold that the jury instructions do not constitute reversible error. In *Cabezuela*, the jury instructions made it impossible to discern whether the defendant was convicted of intentional child abuse, for which she was charged, or for reckless child abuse, for which she was not charged. *Id*. ¶ 36. Here, Defendant was charged with both intentional and reckless child abuse. The jury was instructed on the definitions of reckless acts, in Instruction 3, and intentional acts, in Instruction 4. The special forms provided to the jury made it very clear which crime Defendant was convicted of: intentional child abuse resulting in the death of a child under twelve years of age.

**{30}** Defendant is correct in noting that in *Cabezuela*, "we suggest[ed] that there should be separate instructions for negligent and intentional child abuse." *Id*. ¶ 37. Read in the context of the *Cabezuela* opinion, this suggestion was made in order to avoid verdicts which do not clearly indicate whether the jury finds the defendant guilty of intentional or reckless child abuse. In fact, we recently noted in *Consaul*, albeit in the context of child abuse resulting in great bodily harm, not death, that the purpose of requesting separate instructions is so that the jury's verdict is made clear. *See* 2014-NMSC-030, ¶ 23 ("When two or more different or inconsistent acts or courses of conduct are advanced by the State as alternative theories as to how a child's injuries occurred, then the jury must make an informed and unanimous decision, guided by separate instructions, as to the culpable act the defendant committed and for which he is being punished.").

**{31}** We emphasize that the overriding concern in this case, as it was in *Cabezuela*, is that the jury's verdict must be clear about the crime of which the defendant was convicted. As in *Cabezuela*, the distinction in this case between reckless and intentional conduct is critical because the child abuse resulted in the death of a child under twelve. We have repeatedly explained that the Legislature, in that limited circumstance, has chosen to impose different punishments based solely on the defendant's mental state. *See Consaul*, 2014-NMSC-030, ¶¶ 21-23 (explaining that the punishments for intentional and reckless child abuse resulting in the death of a child under twelve are life in prison and 18 years in prison, respectively); *Cabezuela*, 2011-NMSC-041, ¶ 33 (same), *State v. Garcia*, 2010-NMSC-023, ¶¶ 9-13, 148 N.M. 414, 237 P.3d 716 (same).

**{32}** Clear jury instructions with respect to the defendant's mental state, therefore, are necessary when the abuse results in the death of a child under twelve to properly determine the offense of which Defendant has been found guilty and to guarantee that the verdict is not the result of confusion. We held in *Cabezuela* that separate instructions are one way to achieve that result. *See* 2011-NMSC-041, ¶ 37 (suggesting that the UJI Committee for Criminal Cases draft separate instructions for intentional and reckless child abuse). We hold that the district court's approach in this case was similarly effective, which consisted of

9

using our current jury instructions to clearly define reckless and intentional conduct and providing a step-down instruction with special interrogatories to ensure a unanimous verdict about the element separating the two offenses. We commend the district court for crafting a solution that harmonized our current jury instructions with the concerns raised in our case law.

**{33}** We also reiterate that, while the distinction between reckless and intentional conduct was critical in this case, that distinction is often immaterial when the child abuse does not result in the death of a child under twelve. As we recently explained in *Consaul*, the Legislature has chosen to punish all other types of child abuse the same with respect to the defendant's mental state. *See* 2014-NMSC-030, ¶ 22 ("Here, in contrast, the punishment for child abuse resulting in *great bodily harm*, whether done knowingly, intentionally, negligently, or recklessly, is the same."); *see also* NMSA 1978, § 30-6-1(E) (providing that, whether committed knowingly, intentionally, or negligently, child abuse resulting in great bodily harm is a first-degree felony; that a conviction for a first offense of child abuse not resulting in death or great bodily harm is a third degree felony; and that all subsequent convictions are second degree felonies); § 30-6-1(F) (providing that negligent child abuse resulting in the death of a child is a first degree felony); § 30-6-1(G) (providing that intentional child abuse of a child twelve to eighteen years of age is a first degree felony). As a result, in most cases when the abuse does not result in the death of a child under twelve, it is not necessary to specify the defendant's mental state or to provide separate jury instructions for reckless or intentional conduct; evidence that the defendant acted "knowingly, intentionally *or* [recklessly]" will suffice to support a conviction.[2] Section 30-6-1(D) (emphasis added); *cf. Consaul*, 2014-NMSC-030, ¶ 23 ("Notwithstanding this lack of difference in penalty, child abuse resulting in great bodily harm will *sometimes* also require separate jury instructions . . . ." (emphasis added)). *Accord Model Penal Code* § 2.02(5) ("When recklessness suffices to establish an element, such element also is established if a person acts purposely or knowingly.").

---

[2]We recently found error in *Consaul* when the district court failed to provide separate instructions for reckless and intentional child abuse resulting in great bodily harm because "the State's theories of how that harm occurred were different and inconsistent." 2014-NMSC-030, ¶ 26. Separate instructions were necessary because the State advanced two "different or inconsistent acts or courses of conduct . . . as alternative theories as to how [the] child's injuries occurred." *Id.* ¶ 23. The State originally argued that the defendant recklessly swaddled the child too tightly and laid him face down in his crib. *See id.* ¶ 24. After the State's own experts testified that such conduct could not have caused the child's injuries, the State sought to prove for the first time that the defendant intentionally smothered the child by placing his hand or a pillow over the child's mouth. *See id.* We held that giving a single instruction that allowed the jury to pick between the State's two inconsistent factual theories was reversible error because it made it impossible to determine which theory the jury relied on to convict the defendant. *See id.* ¶¶ 25-26.

**{34}** We conclude that the step-down instruction and special forms used in this case sufficiently clarified that the jury found Defendant guilty of intentional child abuse resulting in the death of a child under twelve years of age. Accordingly, Defendant's conviction is affirmed.

**4. Reckless child abuse resulting in the death of a child under twelve is a lesser-included offense of intentional child abuse resulting in the death of a child under twelve**

**{35}** Our conclusion that the district court properly instructed the jury in this case compels us to clarify another aspect of our case law related to our child abuse jury instructions: whether reckless child abuse may be a lesser-included offense of intentional child abuse. Several opinions of this Court and of the Court of Appeals have touched on this issue, though none have addressed it conclusively. We do so now to avoid confusion about our approval of the district court's use of a step-down instruction, a type of instruction typically reserved for lesser-included offenses. *See* UJI 14-250 (providing the jury procedure for various degrees of homicide); *Garcia*, 2005-NMCA-042, ¶ 18 (discussing the proper procedure under UJI 14-250); UJI 14-6002 NMRA (providing the jury procedure for considering a "necessarily included offense").

**{36}** Our Court of Appeals first addressed this issue, although somewhat obliquely, in *State v. Schoonmaker*, when it had to decide the analytically opposite question for double jeopardy purposes: whether intentional child abuse is a lesser-included offense of reckless child abuse. *See* 2005-NMCA-012, ¶¶ 14-16, 136 N.M. 749, 105 P.3d 302 ("*Schoonmaker I*"), *rev'd on other grounds by State v. Schoonmaker*, 2008-NMSC-010, ¶¶ 1, 54, 143 N.M. 373, 176 P.3d 1105 ("*Schoonmaker II*"), *overruled by Consaul*, 2014-NMSC-030, ¶ 38. The Court rightly observed that "the statutory elements for intentional and negligent child abuse reveal[] that each offense contains an element that the other does not: the mens rea element." *Id*. ¶ 25. It further reasoned "that these two statutes are mutually exclusive—one cannot commit an intentional act and an unintentional but substantially risky act at the same time, even though the act is voluntary as to both and the evidence may be sufficient to charge both offenses as alternative theories." *Id*. ¶ 27. The Court of Appeals therefore "[held] that the crime of intentional child abuse is not the same crime or lesser included crime of negligent child abuse," and affirmed the defendant's convictions. *Id*. ¶¶ 27, 38.

**{37}** We granted certiorari and reversed the Court of Appeals on different grounds. *See Schoonmaker II*, 2008-NMSC-010, ¶ 1 (reversing the defendant's convictions and remanding for a new trial due to ineffective assistance of counsel). However, we addressed the defendant's double jeopardy argument "to avoid repetition of any similar errors on retrial." *Id*. ¶¶ 41, 46-49. In a footnote to that discussion, "[w]e agree[d] with the Court of Appeals' analysis . . . and its holding that intentional child abuse is not the same crime as, or a lesser included offense of, negligent child abuse." *Id*. ¶ 46 n.4. We also explicitly approved of the Court of Appeals' reasoning that intentional and reckless child abuse are "mutually exclusive" crimes. *Id*.

11

**{38}** *Schoonmaker I's* holding that these crimes are mutually exclusive, which we endorsed in *Schoonmaker II*, became the basis for the proposition not only that *intentional* child abuse is not a lesser-included crime of *reckless* child abuse, but also that *reckless* child abuse is not a lesser-included crime of *intentional* child abuse. *See State v. Davis*, 2009-NMCA-067, ¶ 9, 146 N.M. 550, 212 P.3d 438 ("[N]egligent [now "reckless"] child abuse is not a lesser-included offense of intentional child abuse." (citing *Schoonmaker II*, 2010-NMSC-010, ¶ 46 n.4)). We continue to agree that intentional child abuse is not a lesser-included offense of reckless child abuse, but we now clarify that the Court of Appeals' conclusion that the two offenses are mutually exclusive went too far. As we explain below, the statutory elements of reckless child abuse resulting in the death of a child under twelve are a subset of the statutory elements of intentional child abuse resulting in the death of a child under twelve. We therefore hold that reckless child abuse resulting in the death of a child under twelve is a lesser-included offense of intentional child abuse resulting in the death of a child under twelve.

**{39}** A lesser-included offense is "a less serious crime than the one charged, but one that an accused necessarily committed in carrying out the more serious crime." Bryan A. Garner, *Garner's Dictionary of Legal Usage*, 539, 3rd ed. 2011. In *State v. Meadors*, 1995-NMSC-073, ¶¶ 6, 12, 121 N.M. 38, 908 P.2d 731, this Court "set[] forth the test for determining whether one offense is a lesser included offense of another." *State v. Collins*, 2005-NMCA-044, ¶ 9, 137 N.M. 353, 110 P.3d 1090, *overruled on other grounds by State v. Willie*, 2009-NMSC-037, ¶ 18, 146 N.M. 481, 212 P.3d 369. "In *Meadors* we explained that New Mexico follows two distinct approaches for analyzing whether one crime constitutes a lesser-included offense of another." *State v. Campos*, 1996-NMSC-043, ¶ 20, 122 N.M. 148, 921 P.2d 1266. One is the cognate approach, which "requires that only those crimes for which the elements are sufficiently described in the charging document, and for which supporting evidence is adduced at trial, are presented to the jury as lesser-included offenses." *Id.* ¶ 21; *see also Meadors*, 1995-NMSC-073, ¶ 11 (clarifying that we refer to this "test simply as the cognate approach."). Having already concluded that, under the facts of this case, the jury was properly instructed on both theories of child abuse, we need not analyze the cognate approach. We therefore turn to the strict elements test, under which we conclude that reckless child abuse is a lesser-included offense of intentional child abuse. Under the strict elements test, "an offense [is] a lesser-included offense of another only if the statutory elements of the lesser offense are a sub-set of the statutory elements of the greater offense such that it would be impossible ever to commit the greater offense without also committing the lesser offense." *Campos*, 1996-NMSC-043, ¶ 20.

**{40}** Section 30-6-1(D) includes the crimes of both intentional and reckless child abuse:

> Abuse of a child consists of a person knowingly, intentionally or [recklessly], and without justifiable cause, causing or permitting a child to be:
>> (1) placed in a situation that may endanger the child's life or health;
>> (2) tortured, cruelly confined or cruelly punished; or

12

(3) exposed to the inclemency of the weather.

Although this statute lists the mental states of "knowingly, intentionally, or [recklessly]" together in Section 30-6-1(D), describing various crimes of child abuse, the crimes of intentional and reckless abuse resulting in the death of a child under twelve are distinguished by their respective sentences. Reckless child abuse resulting in the death of a child under twelve years of age is a first degree felony punishable by eighteen years imprisonment. NMSA 1978, § 30-6-1(F) (2009) ("A person who commits [reckless] abuse of a child that results in the death of the child is guilty of a first degree felony."); NMSA 1978, § 31-18-15(A)(3) (2003) (stating that the basic sentence for a first degree felony is eighteen years imprisonment). Conversely, intentional child abuse resulting in the death of a child under twelve is punishable by life imprisonment. Section 30-6-1(H) ("A person who commits intentional abuse of a child less than twelve years of age that results in the death of the child is guilty of a first degree felony resulting in the death of a child."); NMSA 1978, Section 31-18-15(A)(1) (2005) (stating that the basic sentence for a first degree felony resulting in the death of a child is life imprisonment). All of the elements of these two crimes are contained in one Section: Section 30-6-1-(D). However, the sentences for these crimes are contained in separate Sections, which distinguish one crime from the other on the sole basis of the level of mens rea required. *See* §§ 30-6-1(F) (reckless) and 30-6-1(H) (intentional). Thus, we agree with *Schoonmaker I* that the only distinction between the two crimes is the level of mens rea required: either intentional or reckless. *See* 2005-NMCA-012, ¶ 25.

**{41}** However, we disagree that intentional and reckless conduct are "mutually exclusive." One can commit child abuse recklessly without acting intentionally, but one cannot intentionally commit child abuse without "consciously disregard[ing] a substantial and unjustifiable risk," the definition of recklessness. *See Consaul*, 2014-NMSC-030, ¶ 37 (citing *Model Penal Code* Section 2.02(2)(c) for definition of "recklessly"); *cf. State v. Garcia*, 1992-NMSC-048, ¶ 21, 114 N.M. 269, 837 P.2d 862 ("Even though an intentional killing includes the element of knowledge of a strong probability of death or great bodily harm, the converse is not necessarily true; a killing with knowledge of the requisite probability does not necessarily include an intentional killing."). We therefore disavow the reasoning in *Schoonmaker I* and all other precedent agreeing that intentional and reckless child abuse are mutually exclusive crimes. We clarify that reckless child abuse resulting in the death of a child under twelve is a lesser-included offense of intentional child abuse resulting in the death of a child under twelve.

**{42}** We emphasize that when district courts are required to determine whether to grant a requested instruction on a lesser-included offense, *Meadors* requires analysis of both the strict elements test and the cognate approach, which "focuses upon both the charging instrument and the evidence adduced at trial." 1995-NMSC-073, ¶¶ 6, 11, 12. When a defendant is charged with intentional child abuse resulting in the death of a child under twelve, the instruction on the lesser-included offense of reckless child abuse should only be given if the evidence could support such a theory. *See State v. Ulibarri*, 1960-NMSC-102, ¶ 8, 67 N.M. 336, 355 P.2d 275 (stating that "the trial court must instruct the jury in every

13

degree of the crime charged when there is evidence in the case tending to sustain such degree."). We further conclude that, when it is appropriate to instruct the jury on the lesser-included crime, it is also appropriate to provide a step-down instruction providing the process by which the jury should consider each charge. Because we hold that both offenses were correctly instructed in this case, we conclude that the use of a step-down instruction was appropriate.

**{43}** Our holding may have important implications in the charging of future child abuse offenses. "When one offense is a lesser included offense of a crime named in a charging document, the defendant is put on notice that he [or she] must defend not only against the greater offense as charged but also against any lesser included offense." *Collins*, 2005-NMCA-044, ¶ 8; *see also Davis*, 2009-NMCA-067, ¶ 8 ("It is improper to instruct the jury as to a crime not formally charged if that crime is not a lesser[-]included offense of the crime formally charged." (alteration in original)). "The defendant's constitutional right to notice of the crime against which he must defend is a consideration that arises when . . . the State requests a jury instruction on a lesser-included offense over the defendant's objection." *Meadors*, 1995-NMSC-073, ¶ 5. Therefore, when a defendant is charged with intentional child abuse resulting in the death of a child under twelve, he or she will be on notice to defend against both intentional and reckless child abuse resulting in the death of a child under twelve when the abuse results from the same conduct or course of conduct. *Cf. Consaul*, 2014-NMSC-030, ¶ 24 (requiring separate instructions when the State advanced two "different and inconsistent theories" as to the conduct or course of conduct amounting to child abuse).

## B. Admission of Expert Testimony

**{44}** Defendant alleges that the district court erred by allowing the expert forensic pathologist to testify that Baby Breandra died of a "constellation of injuries" and that "it was impossible to tell which one might have been the lethal injury or in which order they may have been inflicted." He asserts that the testimony lacked specificity and allowed the jury to speculate on the cause of death. Defendant's argument is not developed beyond this bald assertion, and he makes only vague reference to Rules 11-702 to -704 NMRA to support it. Those rules establish the criteria for expert opinion testimony, but Defendant does not explain how they were violated or otherwise support his contention. Nonetheless, we address this argument.

### 1. Preservation

**{45}** "In order to preserve an issue for appeal, a defendant must make a timely objection that specifically apprises the trial court of the nature of the claimed error and invokes an intelligent ruling thereon." *State v. Walters*, 2007-NMSC-050, ¶ 18, 142 N.M. 644, 168 P.3d 1068 (internal quotation marks and citation omitted); Rule 12-216(A) NMRA ("To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked . . . ."). As the State points out, Defendant failed to object to this testimony and

14

therefore failed to preserve this claim of error for appeal.

## 2.      Standard of review

{**46**}    Because Defendant did not preserve this argument, we review it for plain error. "Under [Rule 11-103(D)-(E) NMRA], this Court may review evidentiary questions although not preserved if the admission of the evidence constitutes plain error." *State v. Contreras*, 1995-NMSC-056, ¶ 23, 120 N.M. 486, 903 P.2d 228. "The plain-error rule, however, applies only if the alleged error affected the substantial rights of the accused." *Id*. To find plain error, the Court "must be convinced that admission of the testimony constituted an injustice that created grave doubts concerning the validity of the verdict." *Id*. (internal quotation marks and citation omitted). Further, "[i]n determining whether there has been plain  . . . error, we must examine the alleged errors in the context of the testimony as a whole." *State v. Dylan J.*, 2009-NMCA-027, ¶ 15, 145 N.M. 719, 204 P.3d 44 (omission in original) (internal quotation marks and citation omitted).

## 3.      The admission of Dr. Krinsky's testimony was not plain error

{**47**}    In *State v. Lucero*, we reviewed the admission of expert testimony for plain error. 1993-NMSC-064, ¶ 13, 116 N.M. 450, 863 P.2d 1071. The expert in that case was a psychologist who interviewed a child who complained about sexual abuse by her uncle. *Id*. ¶¶ 2-3. The State asked that the expert interview the child prior to trial to determine the child's competency. *Id*. ¶ 3. The expert testified that the child suffered from post traumatic stress syndrome and that many of the child's symptoms were consistent with those found in children who have been sexually abused. *Id*. ¶ 4. The sexual abuse, the expert testified, caused the post traumatic stress syndrome. *Id*. As part of this testimony, the expert recounted several statements the child made directly to her, and commented on the demeanor and credibility of the child. *Id*. ¶¶ 6-7.

{**48**}    We held that the admission of this testimony was not harmless error "[b]ecause [the expert] repeated so many of the complainant's statements regarding the alleged sexual abuse by the defendant and because she commented directly and indirectly upon the complainant's truthfulness." *Id*. ¶ 22. We reasoned that the expert's "testimony in [that] case really amounted to a repetition of the complainant's statements regarding sexual abuse made to her during her evaluation" and "[i]n so many words, [the expert] testified that the complainant had in fact been molested." *Id*. ¶ 21. In addition, "[the expert] went a step further and stated that it was the defendant who abused the complainant," and "[s]he also commented that the complainant's statements were truthful." *Id*. We concluded that because the child's credibility was a central issue in the case, and because she and her uncle were the only witnesses to the alleged abuse, it was likely that the jury was swayed by the expert's testimony. *Id*. ¶ 22. Accordingly, we expressed "grave doubts concerning the validity of the verdict and the fairness of the trial." *Id*.

{**49**}    In the case at bar, the record reflects that the piece of Dr. Krinsky's testimony that

15

Defendant selectively relies on to support his argument comes from a colloquy in which Dr. Krinsky identified "multiple blunt force injuries" as the cause of Baby Breandra's death. Dr. Krinsky intimated that a brain injury could have in fact been the fatal blow, but affirmatively asserts that the cause of death was the multiple blunt force injuries. While Dr. Krinsky identified several injuries, she was specific in stating that the injuries together were the cause of death. We find it difficult to imagine how this testimony could lead to jury speculation about the cause of death. Further, Dr. Krinsky made no assertions that Defendant caused these injuries, unlike in *Lucero*, where the expert stated the child's uncle molested her. Finally, unlike *Lucero*, where the expert likely sealed the defendant's fate with her testimony alone, in this case there is ample evidence outside of Dr. Krinsky's testimony to support the jury's finding of guilt. Accordingly, we hold that the admission of Dr. Krinsky's testimony was not plain error.

## C.     Sufficiency of the Evidence

{50}     Defendant claims that the State failed to present sufficient evidence to prove beyond a reasonable doubt that Baby Breandra's injuries were intentional or recklessly inflicted, rather than accidental. Defendant argues that although the evidence presented established that Baby Breandra suffered a constellation of injuries, there was no evidence presented to show that Defendant caused those injuries, either intentionally or recklessly. Defendant cites no cases regarding sufficiency of evidence in support of this argument, and instead cites *State v. Franklin*, 1967-NMSC-151, 78 N.M. 127, 428 P.2d 982 and *State v. Boyer*, 1985-NMCA-029, 103 N.M. 655, 712 P.2d 1. Beyond this, Defendant's argument is undeveloped.

{51}     The State argues that the evidence presented was sufficient to support Defendant's conviction. The State asserts that the evidence that Baby Breandra was uninjured before being left alone with Defendant, that the medical experts determined that the types of injuries Baby Breandra suffered could not have been accidental, and that Defendant admitted to hitting the baby, was sufficient to support Defendant's conviction.

## 1.     Standard of review

{52}     In reviewing the sufficiency of the evidence, "[t]he reviewing court view[s] the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Guerra*, 2012-NMSC-027, ¶ 10, 284 P.3d 1076 (second alteration in original) (internal quotation marks and citation omitted). "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *Id.* (internal quotation marks and citation omitted). "The question before [the] reviewing [c]ourt is not whether [the court] would have had a reasonable doubt [about guilt] but whether it would have been impermissibly unreasonable for a jury to have concluded otherwise." *Id.* (second and fourth alterations in original) (internal quotation marks and citation omitted). "In our determination of the sufficiency of the evidence, we are required to ensure that a

16

rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). "Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject Defendant's version of the facts." *Id.* (internal quotation marks and citation omitted). We do "not evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence," and we do "not weigh the evidence [or] substitute [our] judgment for that of the fact finder so long as there is sufficient evidence to support the verdict." *State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314.

**{53}** "[T]he test to determine the sufficiency of evidence in New Mexico . . . is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *Id.* "Substantial evidence is relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion." *In re Gabriel M.*, 2002-NMCA-047, ¶ 22, 132 N.M. 124, 145 P.3d 64 (alteration in original) (internal quotation marks and citation omitted). "Just because the evidence supporting the conviction was circumstantial does not mean it was not substantial evidence." *Id.* (internal quotation marks and citation omitted). "Intent is subjective and is almost always inferred from other facts in the case, as it is rarely established by direct evidence." *State v. Sosa*, 2000-NMSC-036, ¶ 9, 129 N.M. 767, 14 P.3d 32 (internal quotation marks and citation omitted).

2. **The evidence presented was sufficient to support Defendant's conviction for intentional child abuse**

**{54}** In order to present sufficient evidence for the jury to convict Defendant of intentional child abuse resulting in the death of a child under twelve,

> the State was required to prove beyond a reasonable doubt that (1) Defendant caused Baby [Breandra] to be placed in a situation which endangered her life or health, or tortured or cruelly confined or punished Baby [Breandra]; (2) Defendant acted intentionally; . . . (3) Defendant's actions resulted in the death of or great bodily harm to Baby [Breandra];

(4) Baby Breandra was under the age of twelve; and (5) this happened in New Mexico. *Walters*, 2007-NMSC-050, ¶ 28; *see also* UJI 14-602 NMRA; § 30-6-1(H).

**{55}** The State proved the first and second elements with Defendant's own statement that "I slapped her. I got her by her ears and she didn't want to keep quiet." This statement demonstrates that Defendant endangered the baby's health, and that he acted intentionally. Further, with the forensic pathologist's testimony that the constellation of injuries on Baby Breandra's body were intentional and that the manner of death was homicide, the State showed that the injuries she suffered could not have been caused by accident. *Contra Consaul*, 2014-NMSC-014, ¶ 56 (finding insufficient evidence of child abuse resulting in

17

great bodily harm by intentional suffocation when "expert medical testimony provided the only evidence that [the child] may have been smothered—that a crime had occurred—and that [the child] had not been injured by other, noncriminal causes."). The State proved the third element, that Defendant's actions resulted in the baby's death, with testimony from Defendant's friend Derek Vigil that he had visited Defendant at home on March 8, 2011, and when he left around 11:30 a.m. or noon, he did not see any signs that Baby Breandra was in distress. This shows that the baby was in good health before she was left alone with Defendant. In conjunction, these facts show that Defendant was the only person with the baby when she was intentionally injured, proving that Defendant's acts caused the baby's death. The State proved element four by showing that Baby Breandra's birthday was September 24, 2009, and she died on March 8, 2011. Finally, the State proved the fifth element by showing that these events occurred in Española, New Mexico.

**{56}**    Viewing the evidence in the light most favorable to the verdict, the evidence the State presented in support of Defendant's conviction is enough that a rational juror could have found beyond a reasonable doubt the essential facts required for conviction. We therefore hold that sufficient evidence was presented to support Defendant's conviction.

### D.    Ineffective Assistance of Counsel

**{57}**    Defendant claimed that he was denied effective assistance of counsel. Claims of ineffective assistance of counsel are reviewed de novo. *State v. Boergadine*, 2005-NMCA-028, ¶ 33, 137 N.M. 92, 107 P.3d 532. Defendant abandoned this claim, therefore we do not address it. Although we do not now comment on the merits of this claim, Defendant remains free to raise this issue in a collateral proceeding. *See State v. Baca*, 1997-NMSC-059, ¶ 25, 124 N.M. 333, 950 P.2d 776 ("A record on appeal that provides a basis for remanding to the trial court for an evidentiary hearing on ineffective assistance of counsel is rare. Ordinarily, such claims are heard on petition for writ of habeas corpus . . . ."); *State v. Telles*, 1999-NMCA-013, ¶ 25, 126 N.M. 593, 973 P.2d 845 ("Defendant's proper avenue of relief [from ineffective assistance of counsel] is a post-conviction proceeding that can develop a proper record").

### E.    Sentencing

**{58}**    Defendant argues that the district court's failure to consider mitigating circumstances during sentencing constitutes an abuse of discretion, and asks this Court to remand the case for a new sentencing hearing. The State concedes that Defendant was entitled to present mitigating circumstances prior to sentencing. While we are not bound by the State's concessions on appeal, we agree with the parties and remand to the district court for resentencing, as we discuss below. *See State v. Foster*, 1999-NMSC-007, ¶ 25, 126 N.M. 646, 974 P.2d 140 (stating that appellate courts are not bound by the State's concessions), *abrogated on other grounds by Kersey v. Hatch*, 2010-NMSC-020, ¶ 17, 148 N.M. 381, 237 P.3d 683.

### 1. Procedural background

**{59}** Defendant argues that during sentencing, the district court misunderstood its authority to alter the basic sentence of life imprisonment based on mitigating circumstances pursuant to Section 31-18-15.1(A)(1), and that such misunderstanding was an abuse of discretion. The State concedes this point, agreeing with Defendant that the district court misunderstood the law. The State acknowledges that Defendant was entitled to present claims of mitigating circumstances prior to sentencing, but does not agree that the district court should have altered Defendant's sentence based on the mitigating circumstances presented.

**{60}** After dismissing the jury, the district court proceeded immediately to sentencing. Upon being asked for its recommendation, the State asserted that the district court had no choice but to impose a life sentence. The State presented some of Baby Breandra's family members, including her mother, father, grandmother, and uncle, who all requested the maximum sentence of life in prison. Defendant presented his mother and godmother, who spoke to Defendant's good character.

**{61}** Defense counsel then requested that the district court consider mitigating circumstances under NMSA 1978, Section 31-18-15.1(A) (2009) (enhancement based on aggravating factors recognized as unconstitutional by *State v. Frawley*, 2007-NMSC-057, ¶ 29, 143 N.M. 7, 172 P.3d 144). [4 Tr. 196:5-6] Defendant argued that the mitigating circumstances included the fact that he called the ambulance, cooperated with the police, and had spent a lot of time taking care of Baby Breandra and was close with her. Defendant asked the district court to mitigate up to one-third of the basic sentence.

**{62}** The district court noted that "the law has reserved the stiffest penalties that the State of New Mexico can give [for cases in which] somebody injures or hurts or kills our most vulnerable, our children." The district court then stated that it did not believe it had the authority to alter the sentence because it believed the law required a mandatory life sentence. Accordingly, the district court imposed a life sentence. The State reminded the district court that Defendant had one prior felony conviction, subjecting him to a one-year habitual offender enhancement, which the district court then added to Defendant's life sentence.

### 2. Standard of review

**{63}** "We review the trial court's sentencing for an abuse of discretion." *State v. Sotelo*, 2013-NMCA-028, ¶ 37, 296 P.3d 1232 (internal quotation marks and citation omitted). "The district court has an obligation to consider mitigating factors in sentencing. Failure to do so, whether based on a misapprehension of the authority given by statute or a belief that a formal motion is required, is an abuse of discretion." *Id.* ¶ 45.

### 3. Defendant is entitled to resentencing because the district court's misunderstanding of its authority to alter the basic sentence based on mitigating

**circumstances was an abuse of discretion**

**{64}** "A person who commits intentional abuse of a child less than twelve years of age that results in the death of the child is guilty of a first degree felony resulting in the death of a child." Section 30-6-1(H). "[T]he basic sentence . . . for a first degree felony resulting in the death of a child [is] life imprisonment." Section 31-18-15(A)(1). "The appropriate basic sentence of imprisonment shall be imposed upon a person convicted and sentenced pursuant to [Section 31-18-15(A)], unless the court alters the sentence pursuant to the provisions of the Criminal Sentencing Act." NMSA 1978, § 31-18-15(B) (2007). "The court shall hold a sentencing hearing to determine if mitigating or aggravating circumstances exist and take whatever evidence or statements it deems will aid it in reaching a decision to alter a basic sentence." Section 31-18-15.1(A). "The judge may alter the basic sentence as prescribed in Section 31-18-15 . . . upon . . . a finding by the judge of any mitigating circumstances surrounding the offense or concerning the offender." Section 31-18-15.1(A), (A)(1). The amount by which the sentence may be mitigated must be determined by the judge, but may not exceed one-third of the basic sentence. Section 31-18-15.1(G) (2009).

**{65}** We recently addressed the issue of whether a district court may mitigate a life sentence for a conviction of child abuse resulting in the death of a child under twelve in *State v. Juan*, 2010-NMSC-041, 148 N.M. 747, 242 P.3d 314. The defendant in *Juan* was convicted of "child abuse resulting in the death of a child under twelve years of age." *Id*. ¶ 10. The district court declined to consider mitigating circumstances, concluding "that the Legislature intended that a life sentence be mandatory for child abuse resulting in death, reasoning that the statute provided that the alteration of a sentence could not exceed one-third of the basic sentence and one-third of a life sentence could not be calculated." *Id*. ¶ 35.

**{66}** On appeal to this Court, the defendant in *Juan* claimed that the district court erred by failing to consider mitigating circumstances. *Id*. ¶ 36. We observed that "Sections 31-18-15 and 31-18-15.1 explicitly grant the trial court the authority to alter the basic sentence for all noncapital felonies, including those that carry a basic sentence of life imprisonment." *Juan*, 2010-NMSC-041, ¶ 39. We noted that "[a] statute must be construed so that no part of the statute is rendered surplusage or superfluous," and concluded that in order to conclude that district courts lacked authority to mitigate a basic life sentence for a conviction of child abuse resulting in death, we would have "to read Subsections (A)(1) and (A)(2) out of Section 31-18-15, which we cannot and will not do." *Juan*, 2010-NMSC-041,¶ 39 (internal quotation marks and citation omitted). Thus, we held that "Sections 31-18-15 and 31-18-15.1 grant the trial court the authority to alter the basic sentence of life imprisonment for noncapital felonies." *Juan*, 2010-NMSC-041, ¶ 39. Further, we held "that the thirty-year term for parole eligibility is the proper numerical standard by which to measure the trial court's authority to alter a basic sentence of life imprisonment," and district courts could therefore reduce a life sentence by up to one-third of thirty, or ten years. *Id*. ¶ 41.

**{67}** In *Juan*, we also highlighted the Legislature's distinction between noncapital

20

felonies, which carry a basic sentence of life imprisonment, and capital felonies, which carry a mandatory sentence of life imprisonment. *Id.* ¶ 42. The basic sentence of life imprisonment for a first degree felony resulting in the death of a child is set out in the noncapital felony sentencing statute, Section 31-18-15(A)(1). Accordingly, we held that "[u]nlike a mandatory sentence of life imprisonment, a basic sentence of life imprisonment is subject to alteration . . . if the trial court finds 'any mitigating circumstances surrounding the offense or concerning the offender.'" *Juan*, 2010-NMSC-041, ¶ 42 (quoting Section 31-18-15.1(A)(1)). We determined that the district court "improperly failed to consider mitigating evidence at [the d]efendant's sentencing hearing pursuant to Sections 31-18-15 and 31-18-15.1." *Juan*, 2010-NMSC-041, ¶ 43.

**{68}** Here, the district court's misunderstanding of its authority and obligation to consider mitigating circumstances, which resulted in its failure to consider altering the basic sentence, was an abuse of discretion. Therefore, we reiterate that when issuing a basic life sentence subject to alteration, district courts have the authority, and the obligation, to consider potential mitigating circumstances, and we remand to the district court for resentencing to determine whether the sentence should be altered.

## III. CONCLUSION

**{69}** While we acknowledge that it would have been ideal for the district court below to issue two completely separate instructions for the elements of intentional and reckless child abuse, we hold that the instructions issued, along with the special verdict forms, were sufficient as a whole to accurately instruct the jury on the law and do not constitute reversible error. In order to clarify our cases on child abuse jury instructions, we further hold that reckless child abuse resulting in the death of a child under twelve is a lesser-included offense of intentional child abuse resulting in the death of a child under twelve, and defendants should accordingly be on notice to defend against both. If a defendant is charged with intentional child abuse, and the evidence presented could support a theory of either intentional or reckless abuse, separate instructions for the elements of each theory should be given, along with a step-down instruction on the procedure for considering each theory.

**{70}** Next, we find no error in the district court's admission of Dr. Krinsky's expert testimony, and we find that sufficient evidence was presented to support Defendant's conviction. Finally, we hold that the district court's refusal to consider mitigating factors when sentencing Defendant, based on its belief that the sentence could not be altered, was an abuse of discretion. Thus, finding no reversible error, we affirm Defendant's conviction for intentional child abuse resulting in the death of a child under twelve, and remand to the district court for resentencing to decide whether Defendant's sentence should be altered based on the district court's consideration of potential mitigating factors.

**{71} IT IS SO ORDERED.**

---

                                            **BARBARA J. VIGIL, Chief Justice**

**WE CONCUR:**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**RICHARD C. BOSSON, Justice**

_____

**EDWARD L. CHÁVEZ, Justice**

_____

**CHARLES W. DANIELS, Justice**